United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WELLS FARGO LOAN PROCESSOR OVERTIME PAY LITIGATION | MDL Docket No. C-07-1841 (EMC) |
| THIS DOCUMENT RELATES TO ALL CASES | **ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL CLASS SETTLEMENT APPROVAL** |
| _____/ | **(Docket No. 179)** |

## I.  INTRODUCTION

Plaintiffs' unopposed Motion for Final Class Settlement Approval came on regularly for hearing on July 18, 2011, at 2:00 p.m. in this Court. Docket No. 179 ("Mot."). The parties previously requested preliminary approval of a class settlement agreement, which the Court granted on June 22, 2010, Docket No. 169, as modified on January 24, 2011, Docket No. 175. Due and adequate notice having been given of the proposed settlement as required in the Preliminary Approval Order, and the Court having considered all papers submitted and proceedings held herein, the motion is hereby **GRANTED**.

## II.  BACKGROUND

On January 19, 2006, Plaintiff Trudy Bowne filed a complaint in the District of Kansas captioned *Bowne v. Wells Fargo Home Mortgage*, No. 07-3013 ("*Bowne*"). *Bowne* was a Fair Labor Standards Act collective action on behalf of 75 Loan Processors[1] who opted into the case. On

---

[1] Pursuant to the settlement agreement, a "Loan Processor" is any employee who held any of the following positions from January 21, 2003, through the date of Preliminary Approval: mortgage loan specialist, mortgage sales assistants, mortgage assistants, mortgage sales associates, mortgage associates, loan document specialists and loan documentation specialists.

1  January 21, 2007, Plaintiffs Mary Basore and Brenda McMillian filed a complaint in the Northern
2  District of California captioned *Basore v. Wells Fargo Home Mortgage, et al.*, No. 07-0461
3  ("*Basore*"). *Basore* was a class action on behalf of Loan Processors seeking certification pursuant to
4  Rule 23 under several legal theories, including failure to pay overtime wages, meal and rest period
5  wages, straight time wages, and all wages due and owing at termination. Wells Fargo moved for
6  transfer and consolidation of both cases for pretrial purposes pursuant to 28 U.S.C. § 1407, and on
7  June 22, 2007, the Judicial Panel on Multidistrict Litigation transferred *Bowne* and *Basore* to this
8  Court. On November 13, 2007, this Court entered its initial case management order and
9  consolidated and coordinated the *Bowne* and *Basore* cases, now referred to as the *In re Wells Fargo*
10 *Loan Processor Overtime Pay Litigation*, MDL Docket No. 1841.

11     Plaintiffs were permitted to file their Amended Consolidated Complaint in this Court (the
12 "Amended Complaint") on June 16, 2008. Docket No. 89 ("Am. Compl."). Plaintiffs' Amended
13 Complaint was on behalf of an expanded California Class and a Nationwide Class of non-exempt
14 Wells Fargo team members. It was predicated on Wells Fargo's pay policy called "Standard
15 Hours," which applied to all non-exempt team members, including but not limited to Loan
16 Processors. Plaintiffs alleged that "Standard Hours" was a uniform compensation policy, under
17 which full time non-exempt class members received pre-determined pay for 86.67 hours per semi-
18 monthly pay period, regardless of how many hours they actually worked during that time. Am.
19 Compl., ¶¶ 26-34. Plaintiffs contended that they were treated as salaried employees even though
20 they were classified as hourly employees. *Id.* ¶ 28. Indeed, according to Plaintiffs, full time class
21 members worked more than the allotted hours during most pay periods. *Id.* ¶¶ 29-30. Class
22 members could only receive overtime pay if their managers approved them for "exception" pay;
23 without such approval, they received no overtime even if they had already worked those hours. *Id.*
24 ¶¶ 26-27. Plaintiffs claimed further that Wells Fargo failed to implement an accurate time-keeping
25 requirement until 2006. *Id.* ¶¶ 28-34. Before that, due to the Standard Hours policy, many class
26 members did not accurately record the hours they worked. *Id.* ¶¶ 5-6.

27     Plaintiffs alleged that Wells Fargo's Standard Hours policy resulted in violations of
28 California Business and Professions Code § 17200 (unlawful and unfair business practices), *id*. ¶¶

79-88; California Labor Code §§ 510 and 1198, and California Industrial Wage Order No. 4, 8 C.C.R. § 11040 (failure to pay overtime), *id*. ¶¶ 89-94; California Labor Code § 226.7 (failure to provide rest and meal periods), *id*. ¶¶ 95-102 ; California Labor Code §§ 201-03 (failure to pay wages due on termination), *id*. ¶¶ 103-05; California Labor Code § 226 (failure to provide accurate statements of time worked), *id*. ¶¶ 106-10; California Labor Code § 218 (failure to pay straight time), *id*. ¶¶ 111-15; and FLSA, 29 U.S.C. § 201 *et seq.* (failure to keep accurate records and pay wages due), *id*. ¶¶ 116-24.

Wells Fargo denied any liability stemming from the Standard Hours policy. It argued that its Loan Processors were paid on a salary basis and that its pay policies complied with both FLSA and state law. Opp. to Class Cert., Docket No. 121 ("Opp.") at 11-15. Defendants contended that Standard Hours was not inconsistent with employees' non-exempt status because the policy included a method for calculating and compensating overtime. *Id*. at 13-14.

Plaintiffs filed their motion for class certification on April 13, 2009. *See* Docket No. 116. They sought certification of both a California class and a nationwide Unfair Competition Law ("UCL") class. Mot. for Class Cert. at 10. Plaintiffs' motion referenced voluminous discovery materials and included an expert report from Dr. Ted Anderson, who opined that Wells Fargo's timekeeping and payroll records were easily susceptible to analysis regarding the issues in this case and that "damages can be readily ascertained for all employees." Anderson Decl., ¶ 5. Wells Fargo objected to class certification. It argued that the Standard Hours policy was lawful, and that any alleged harms were individualized because each manager individually approved or denied exception pay. Opp. at 11-18. Therefore, the claims were not susceptible to class treatment. In addition, Wells Fargo argued that adjudication of the state law claims related to meal and rest periods and other alleged violations would require individualized analysis. *Id*. at 19.

The Court held an August 10, 2009 hearing on Plaintiffs' motion for class certification. At the hearing, the parties agreed to suspend the motion for class certification with respect to the Nationwide UCL Class. After the hearing, the parties requested that the Court stay the case to permit the parties to participate in mediation in an attempt to settle the Lawsuit. The case has been stayed since September 8, 2009.

After lengthy negotiations, the parties reached a settlement. Dirks Decl., Docket No. 165, Ex. A, as modified by Docket No. 170, Ex. A ("Settlement Agreement"). The settlement agreement divides the class into three partially overlapping sub-groups. Class A constitutes the 75 people who opted into the *Bowne* and *Basore* litigation. Settlement Agreement, ¶ 1.4. Class B is made up of about 592 people who did not join the litigation, but who recorded 5 hour more hours of overtime that was not approved in WebTime by a manager during the time that manager approval in WebTime was required for the payment of overtime, from January 21, 2003 through the date of Preliminary Approval. *Id*. ¶ 3.2. Class C is a California class of about 3,102 loan processors employed by Wells Fargo during the period between January 21, 2003, and the date of Preliminary Approval. *Id*. ¶ 3.3. The total number of class members is 3,544. The Court granted preliminary settlement approval on June 22, 2010, Docket No. 169, as modified on January 24, 2011, Docket No. 175. The Court also certified the class for purposes of settlement at that time. Docket No. 169.

Once the parties received preliminary approval, the class members received notice of the settlement and were given 60 days to opt out or file a claim form if applicable (Class C), or to file an objection with the Court. Settlement Agreement, ¶¶ 6.2, 6.10. Nine individuals opted out of the settlement and are, therefore, not included in or bound by this Order and may individually pursue claims (if any) against Defendants. Class members who do not opt out agree to release all claims alleged in, related to, or "arising out of the same factual predicate" as this litigation. *Id*. ¶ 9. The parties will jointly stipulate to dismissing the case with prejudice following final approval of the settlement.

The settlement fund is made up of $7,218,512, which is divided into three categories. First, a non-reversionary fund contains $3,115,193, which will be distributed to all class members. Mot. at 6. Class members are to receive payments according to a formula taking into account factors such as the duration of their employment, their hourly wage, the state in which they worked, the amount of unapproved time recorded (Class B), their participation as an opt-in Plaintiff, and the time period during which they worked. Settlement Agreement, ¶ 6.5(A). In addition, each class representative will receive $7,500, and each class member who participated in discovery and was deposed will receive $1,000 in Incentive Awards. Mot. at 15. This fund is also the source of payment for the

Third Party Administrator. Settlement Agreement, ¶ 7.1. Class Counsel represented to the Court that the Third Party Administrator will receive fees in the amount of $55,000.

Second, a claims-made fund offers up to $2,545,579 to be distributed to Class C members for "off the clock" overtime claims, provided they returned a claim form stating that they worked unrecorded overtime at some point during their employment with Wells Fargo. *See* Dirks Decl., Docket No. 180, Ex. A at 2. Class C members who file a claim form are to receive a *pro rata* allocation of the claims-made fund according to their number of compensable workweeks and hourly wage as a loan processor. *Id.* Each member's share of the fund "will be based on his or her eligible workweeks as a percentage of overall Class C eligible workweeks." *Id.* Class members have now claimed just over half of the claims-made fund, or $1,287,667.68. Mot. at 7.

The average award across all subclasses, post-claims process, is $1,218. *Id.* Overall, of the $5,660,772 originally made available to the class, $4,320,360.84 will actually be paid to the class. *Id.*

Finally, $1,557,739 has been set aside for attorneys' fees and litigation costs. Mot. at 6.

### III. DISCUSSION

If the parties "reach a settlement agreement prior to class certification, the court is under an obligation to 'peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement.'" *Singer v. Becton Dickinson & Co.*, No. 08-CV-821-IEG, 2010 WL 2196104 (S.D. Cal. June 1, 2010) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003)); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). In this case, however, the Court has already granted class certification for settlement purposes. *See* Docket No. 169, ¶ 2 ("The Court further finds that the class should be certified for the purposes of settlement."). Therefore, this Court need only review the fairness of the settlement.

The Court may approve a proposed class settlement agreement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). This Court has discretion to approve or deny a proposed settlement, but the Court may not pick and choose portions of a proposed agreement. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026-27 (9th Cir. 1998). As the Ninth Circuit has noted, "Settlement is the offspring of compromise; the question . . . is not whether

the final product could be prettier, smarter, or snazzier, but whether it is fair, adequate, and free from collusion." *Id*.

*Hanlon* identifies several factors the Court should consider in evaluating the fairness of a proposed settlement agreement:

> [T]he strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; . . . and the reaction of the class members to the proposed settlement.

*Id*. However, the final fairness determination must rest on "the settlement taken as a whole, rather than the individual component parts." *Id.* at 1026.

A.   Notice

In order to obtain approval of a class settlement agreement, the Court must direct the parties to provide "notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. Pro. 23(e)(1). In addition, Rule 23(c)(2) requires the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Substantively, class members must receive notice of the following information:

> (i)   the nature of the action;
> (ii)  the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv)  that a class member may enter an appearance through an attorney if the member so desires;
> (v)   that the court will exclude from the class any member who requests exclusion;
> (vi)  the time and manner for requesting exclusion; and
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B); *see also Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) (quotation omitted) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."). These criteria ensure that the notice provided satisfies due process. *See Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 963 (9th Cir. 2009) ("[T]he Notice communicated the essentials of the proposed settlement in a sufficiently balanced, accurate, and

informative way to satisfy due process concerns.") In this case, the notice of class settlement reached each member of the class and clearly explained the terms of the settlement. It disclosed all material elements of the settlement, including class members' release of claims, their ability to opt out or object to the settlement, the amount of incentive awards and attorneys' fees sought, and estimates of the award members could expect to receive. Dirks Decl., Docket No. 180, Ex. A. The notice was thus adequate.

B.  Fairness of the Settlement

　　1.  Strength of the Plaintiffs' Case

The parties of course dispute the strength of Plaintiffs' case on the merits. One question is whether the Standard Hours policy was facially illegal and whether that policy resulted in the failure to pay straight-time wages owed to class members. Within that debate, questions are raised as to whether Standard Hours created a salary-based or hours-based compensation scheme with respect to class members, and whether there was underpayment and failure to pay overtime resulting from the class-wide Standard Hours policy rather than from certain distinct managers' implementations of that policy. The litigation raised other questions as well including whether Defendants kept inaccurate time records, whether the manager-approved overtime policy was valid, how much if any unreported overtime was not paid, whether Defendants provided meal and rest periods, and whether Plaintiffs' nationwide class could assert California UCL claims. Ultimately, the merits of many of Plaintiffs' claims depend largely on a fact-intensive inquiry into multiple questions. Both parties point to portions of deposition testimony and documents produced supporting their positions, but the ultimate outcome if the case proceeded to trial remains difficult to predict at this stage. In addition to uncertainty as to facts, ongoing cases pertinent to this litigation – including *Sullivan v. Oracle Corp.*, 2011 WL 2569530 (Cal. June 30, 2011), and *Brinker v. Superior Court*, 80 Cal. Rptr. 3d 781 (Cal. Ct. App. 2008) – further complicate the parties' legal theories relating to application of the California UCL and meal period violation claims.

Furthermore, assuming some liability on Wells Fargo's part, the scope of any relief awarded to Plaintiffs is still more uncertain at this juncture given the limited discovery Wells Fargo provided data for several hundred employees before the motion for class certification. Plaintiffs contend that

their expert, Dr. Anderson, would be able to calculate the damages incurred in the case. *See* Mot. at 2. They provide preliminary estimates based on the documents Wells Fargo had disclosed so far in the litigation, including an alleged 19,388.68 hours of alleged uncompensated straight time, 1,425 pay periods in which employees received no compensation for recorded overtime, and 191 individuals who were underpaid in vacation pay. *See id.* at 9, ¶ 18. However, damages asserted based on unrecorded overtime would likely be more difficult to demonstrate given the lack of a paper trail and require inferences and extrapolations, likely to be disputed.

In sum, while Plaintiffs' initial data indicate a potentially strong case, fact-intensive inquiries and developing case law present significant risks to Plaintiffs' claims and potential recovery. On the other hand, Class Counsel represented to the Court that they believed Wells Fargo faced a potential exposure of $20 million if the case proceeded to trial. The settlement thus alleviates significant uncertainty for both sides and balances the parties' respective positions about the merits of Plaintiffs' case. Accordingly, this factor supports final approval.

2.      <u>Risk, Complexity, and Likely Duration of Further Litigation</u>

Plaintiffs argue that both parties face substantial risks and inevitable expensive delays if they proceed to trial. Mot. at 10. First, the litigation was far from over. Plaintiffs' motion for class certification is still pending and, if the Court granted class certification, the parties would have to navigate a Rule 23(f) appeal before proceeding with further litigation. Additional discovery would also be necessary.

Second, if Plaintiffs prevail on their claims, the damages phase would likely require substantial expert and consultant time. Some class members have records of their overtime and straight time hours worked, which would make those damages calculations relatively simple and easily aggregated. However, Plaintiffs allege that many class members, in addition to overtime hours that were recorded but not "approved" for payment, also worked additional "off the clock" hours for which there is no record. Depending on the alleged scale of those off the clock hours, this could present a complex and difficult-to-resolve issue in the litigation. The settlement agreement alleviates this complexity by allocating money to anyone who claims he or she worked such hours, without requiring the claimant to document the nature and extent of his or her off the clock work.

Without a settlement agreement, the parties estimate at least an additional three years before class members would receive any payment, assuming they are entitled to one. *See* Mot. at 10. This factor thus weighs in favor of final approval.

### 3. Risk of Maintaining Class Action Status Throughout Trial

Plaintiffs argue that a substantial degree of uncertainty remains as to class certification because the Court had yet to rule on Plaintiffs' motion, which Defendants had vigorously opposed. The Court has certified the class only for purposes of settlement. Docket No. 169 ¶ 2. Therefore, the parties argue, the settlement removes a serious risk of delay and adverse decisions against class members. Mot. at 12.

The Court agrees. On the one hand, Plaintiffs have a strong argument that even if not all issues are identical among class members (*e.g.*, which class members worked off the clock hours), there are still overarching (common) questions such as whether the Standard Hours policy is illegal on its face. *See* Compl. ¶¶ 22-31; *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (requiring a court to analyze "the relationship between the common and individual issues" to determine whether the common issues are sufficiently dominant to justify representative adjudication); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." (quotation omitted). On the other hand, if Defendants were able to demonstrate that the Standard Hours policy was facially lawful, class certification may have been more difficult to maintain. If the Standard Hours policy is facially valid, Defendants argued, any problems in its application may vary significantly among class members because they may depend on individual managers' implementation of the policy. Opp. at 16-19. Further, there could be a substantial question as to whether there was a common practice, pattern, or policy with regard to managers' approval of overtime and the employees' understanding as to whether they could or should seek authorization for overtime. These arguments could be particularly challenging for Plaintiffs in light of the Supreme Court's recent decision in *Wal-Mart v. Dukes*, 131 S. Ct. 2541 (2011). While the parties dispute the significance of *Wal-Mart* with respect to this case, at the very least, *Wal-Mart* adds an

additional layer of uncertainty to the question of commonality. *See id.* at *2554-55 (finding no commonality because "[r]espondents have not identified a common mode of exercising discretion that pervades the entire company"). In addition, notwithstanding Plaintiffs' expert's statements to the contrary, the Court may have found damages too difficult to calculate on a class-wide basis if Defendants could demonstrate wide variation within the class in number of straight time hours worked, overtime hours recorded or off the clock, etc. The class settlement successfully removes these risks from the class members and allows them to claim a guaranteed settlement without further delay. This factor thus counsels in favor of final approval.

### 4. Amount Offered in Settlement

The settlement fund offered a total of $7,218,512 to resolve the litigation. Mot. at 6. From that fund, $5,660,772 was available to distribute to class members ($3,115,193 in a non-reversionary fund, and $2,545,579 in a claims-made fund). *Id.* The fund offered $1,597 on average to each class member free of legal fees. *Id.* at 9. Class Counsel represented to the Court that approximately 1,265 Class C members timely returned claim forms, or about 41% of the members of Class C. These members will receive just over half of the reversionary fund, or $1,287,667.68. Thus, Wells Fargo will pay a total of $4,320,360.84 to class members exclusive of attorneys' fees (76% of the funds made available), or a per capita average of $1,218. *Id.* Half of the settlement amount each class member receives is subject to taxes, and the other half is considered interest or penalties. Dirks Decl., Docket No. 180, Ex. A at 4-5. In addition, Wells Fargo will pay $1,557,739 in attorneys' fees. In total, Wells Fargo has agreed to pay $5,878,099.84 according to the terms of the agreement.

Class Counsel represented to the Court that they believed Wells Fargo faced a potential exposure of $20 million if the case proceeded to trial. Wells Fargo provided a much lower assessment of $2-3 million. Even, using the Plaintiffs' assumption, the final settlement constitutes roughly 29% of Defendants' purported total exposure. Net of attorneys' fees, the settlement amounts to 21.6% of that exposure. Courts have approved similar amounts as reasonable. *See, e.g.*, *Singer v. Becton Dickinson & Co.*, No. C-08-821, 2009 WL 4809646 (S.D. Cal. Dec. 9, 2009) (granting preliminary approval for a settlement offering class members 26% of their claimed losses); *Glass v. UBS Fin. Serv., Inc.*, No. C-06-4068, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007)

1  (citing the uncertainty of litigation in finding a settlement in the range of 25-35% of claimed
2  damages appropriate).  That there is ambiguity in the parties' estimates need not prevent courts from
3  approving settlement agreements where the fund is reasonable and fair in light of the uncertainties in
4  the case.  *See In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454 (9th Cir. 2000)
5  (approving a $2 million settlement after parties estimated between $4 million and $12 million in
6  losses).

7  One weakness in the settlement is the claims-made fund which required Class C members to
8  file a claim form in order to receive more than the minimum settlement payment.  Class C members
9  who did nothing will receive only the minimum payment from the non-reversionary fund under the
10 settlement (approximately $475).  Dirks Decl., Docket No. 180, Ex. A at 4-5.  If members filled out
11 the Claim Form (which appears to be only a signature representing they worked off the clock hours
12 at some time), they were told their settlement amount would increase to approximately $1000.  *Id*.
13 According to Plaintiffs, approximately 41% of Class C members returned claim forms and will claim
14 about half of this fund; thus, about $1.265 million will revert to Wells Fargo.  The question arises
15 whether a claims process is truly necessary.

16 However, the parties defend the need for this claims-made fund by explaining that many
17 Class C members (California Loan Processors) have already received substantial overtime pay.
18 Therefore, in order to separate compensated from uncompensated overtime (thus preventing an
19 unjustified windfall to certain employees), the parties required Class C members to submit a claim
20 form stating they had worked unpaid, off the clock overtime.  Mot. at 7.  Thus, there is a valid and
21 substantial justification for the claims process.  Under these circumstances, the Court finds that the
22 amount and composition of the settlement fund, particularly in view of the litigation risks, weighs in
23 favor of final approval.

24  5.  Extent of Discovery Completed and Stage of Proceedings

25 The parties had engaged in substantial discovery prior to executing the settlement agreement.
26 They exchanged interrogatories and requests for production over the course of three years, and took
27 twenty depositions in total.  Mot. at 9.  Plaintiffs also had the opportunity to review portions of
28 Wells Fargo's time and compensation records relating to subset of employees.  *Id*.  Plaintiffs used

11

this data in their motion for class certification, which included an expert report (discussed above) concluding that Defendants' data was susceptible to accurate damages calculations. *See* Anderson Decl. The parties also exchanged additional documents during the mediation process, and Plaintiffs' counsel engaged in varied communications with class members to determine "the compensability and value of class claims." Settlement Agreement, Docket No. 165 Ex. A. Thus, the parties had sufficient information with which to engage in substantive settlement negotiations. *See Gribble v. Cool Transports Inc.*, No. CV 06-04863, 2008 WL 5281665, at *9 (C.D. Cal. Dec. 15, 2008).

### 6. Experience and Views of Counsel

When experienced counsel conclude that a proposed settlement agreement is fair, such a conclusion is entitled to "great weight." *Id*. In this case, Plaintiffs' counsel has extensive class action and complex litigation experience. *See* Docket No. 181, Hanson Decl. (describing firm's exclusive focus on complex litigation and listing twenty-seven wage and hour class and collective actions in which Hanson was lead or co-lead counsel); Dirks Decl., Docket No. 165, Ex. C (describing firm's experience). Class Counsel avers that the settlement is "substantial" in comparison to similar cases. Furthermore, counsel on both sides emphasize that settlement negotiations were conducted at arm's length and vigorously contested. Such a representation on the part of experienced counsel generates a presumption of fairness with respect to the agreement. *See Gribble*, 2008 WL 5281665 at *9. Therefore, this factor weighs in favor of approving the settlement.

### 7. Reaction of the Class

In this case, the reaction of the class was supportive of the settlement. Of the approximately 3,544 individuals receiving notice, 3,535 (or 99.75%) remained part of the settlement and will receive a distribution from the settlement. Mot. at 12. Of the 3,102 Class C members, all of whom were subject to the claims-made fund, counsel represented to the Court that approximately 1,265, or 41%, have returned a claim form and will receive compensation from that fund. Only nine members have opted out of the class. Mot. at 12.

Only one class member has filed an objection to the settlement. Nicola Davies objects to the class settlement because she argues the class has been defined too broadly and includes mortgage

associates like her who have brought another class action in San Francisco Superior Court and whose job descriptions differ substantially from those of class representatives like Ms. Basore. She argues that the sole class representative who is a mortgage associate does not represent her interests because that person is in Iowa and cannot assert California Labor Code claims. Docket No. 176. She also contends that the parties' data – which formed the basis of their settlement negotiations – may not accurately reflect the hours that mortgage associates worked.

   Ms. Davies' arguments are unpersuasive. First, the Court notes that Ms. Davies filed her suit years after the suits at issue here had commenced, and one and a half years after the MDL had been formed. Mot. at 12. Second, Ms. Davies' factual contentions regarding the differences between her job and that of the class representatives are incorrect. Specifically, Plaintiffs have presented personnel records of Ms. Basore and Ms. Davies showing that they held the same job, with the same internal job code. *See* Dirks Decl., Docket No. 180, Ex. C (personnel file of Mary Basore); Ex. D (Decl. of Joan Tucker Fife). Indeed, Defendants' counsel represented to the Court that class representative Ms. Basore received an almost identical rate of pay ($18.11 per hour) to Ms. Davies ($18.51 per hour). Moreover, as Plaintiffs point out, the same pay policy applied to all job titles in the class. Mot. at 13. The data sample Wells Fargo provided to Plaintiffs included data sets for a subset of employees and pulled from each job title included in the class; there is no indication that the sample cannot fairly and properly be aggregated to the class as a whole for purposes of settlement. Ms. Davies merely offers speculation about differences in job duties with no information as to any real-world differences in work conditions that would be germane to the adequacy of the class representatives or which would affect commonality or typicality. Notably, she does not object to the terms of the settlement or its fairness on any other grounds, and she has not opted out of the class. *Id.* Nor has she presented any evidence of a conflict of interest between class representatives and class members that would call the settlement into question. *Cf. Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) (disapproving of incentive agreements that "created an unacceptable disconnect between the interests of the contracting representatives and class counsel, on the one hand, and members of the class on the other."). The Court thus overrules Ms. Davies's objection to the class settlement.

Plaintiffs request that the Court require Ms. Davies to post an appeal bond if she intends to appeal the settlement. Mot. at 14-15. The Court has discretion to require such a bond under Federal Rule of Appellate Procedure 7 if "necessary to ensure payment of costs on appeal." Factors that are relevant to the Court's decision on this issue include:

> (1) the appellant's financial ability to post a bond; (2) the risk that the appellant would not pay the appellee's costs if the appeal loses; [and] (3) the merits of the appeal.

*Fleury v. Richemont N. Am., Inc.*, No. C-05-4525 EMC, 2008 WL 4680033 (N.D. Cal. Oct. 21, 2008). Ms. Davies made no argument regarding her financial ability to post a bond or the risk that she would not pay appellees' costs on appeal. Rather, her sole argument against the appeal bond was that the appeal was in good faith and not frivolous. As discussed above, the Court finds that Ms. Davies' objections are unlikely to prevail on appeal, and therefore a bond would be appropriate. Plaintiffs' counsel requested a $100,000 appeal bond, which the Court finds unnecessary. The Court will therefore order Ms. Davies to post a $20,000 appeal bond if she intends to appeal the settlement.

C.     Attorneys' Fees

Attorneys' fees included in proposed class action settlements, like the settlement as a whole, must be "fundamentally fair, adequate and reasonable." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003). In evaluating proposed attorneys' fees, the court has discretion to use either the percentage-of-the-fund or the lodestar method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).

In this case, Class Counsel requests $1,557,739 in attorneys' fees and costs. Mot. at 17. Class members have received notice of counsel's intent to seek fees in this amount, and no class member has objected. The requested fees are approximately 25% of the final settlement fund, which is at or below the standard range. *See, e.g.*, *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (referring to 25% as the "standard award"); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (referring to 20-30% as the "usual range" of fees); *In re Wells Fargo Home Mortgage Overtime Pay Litigation*, No. 06-md-1770 ("*Wells Fargo I*"), Docket No. 396 (approving attorneys' fees constituting 25% of the settlement in another wage and hour case against Wells Fargo involving the same counsel).

Class Counsel also provided the Court with detailed documentation of their time and expense reports pursuant to the lodestar method. The summary indicates that, since they began work on the case on January 16, 2006, the firm has billed $1.8 million for 3,761.5 hours of work based on their standard rates. The rates charged are comparable to those approved in other class action litigation, and identical to the recent Wells Fargo MDL involving the same counsel. *See* Docket No. 181 ¶ 11 ("[T]his Court approved Plaintiffs' counsels' fee request after Plaintiffs' counsel submitted the same rates of $675 per hour for George Hanson, $500 per hour for Eric Dirks, and rates of $125 to $225 per hour for professional staff."); *see also Wells Fargo I*, Docket No. 396. In addition, counsel incurred over $260,000 in direct expenses which they have also adequately documented to the Court. According to the documents, were the attorneys to simply bill their clients, they would charge $2,064,203.73. The fee request here is less than the lodestar. Given the duration, complexity, and risk of this litigation, the substantive results counsel has achieved in favor of the class, the contingent nature of the fee, and the fact that courts have approved similar rates in other recent litigation, the Court approves $1,557,739 in attorneys' fees and costs as fair and reasonable. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002) (describing factors a court considers in determining the reasonableness of requested fees).

D.  <u>Incentive Awards</u>

The settlement agreement offers incentive awards of $7,500 per class representative as compensation for their involvement in the case for the past five years, including appearing for depositions, assisting with written discovery, and working with Class Counsel to manage the settlement process. *See* Mot. at 15. Plaintiffs also request $1,000 for each opt-in Plaintiff who "responded to written discovery and who [was] deposed." Mot. at 15.

To evaluate proposed incentive awards, the Court can consider numerous factors, including

> (1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation and; (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995). Under these criteria,

the requested awards are reasonable compared to other recent cases. *See, e.g.*, *Jacobs v. Cal. State Auto. Ass'n Inter-Ins. Bureau*, 2009 WL 3562871, *5 (N.D. Cal. Oct. 27, 2009) ("Recognizing that Jacobs spent somewhat more time assisting counsel than occurs in the average case resulting in a $5,000 incentive payment, the court grants Jacobs an incentive payment of $7,500."). For example, the named plaintiff in *Jacobs* did not appear to participate in depositions; rather, he simply "conferr[ed] over discovery matters, gather[ed] documents, convers[ed] with Class Counsel and other Class members, and advis[ed] Counsel of his various opinions during settlement negotiations." *Id.* Because the Plaintiffs in this case have been involved in the litigation for many years and have spent time and money on written discovery and depositions, these incentive awards are fair and reasonable. The Court thus approves the payment of Incentive Awards in the amount of $7,500 for each of the three named Plaintiffs, Mary Basore, Brenda McMillian and Trudy Bowne, and approves Incentive Awards in the amount of $1,000 for each of the six opt-in Plaintiffs who gave depositions.

### IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. Pursuant to this Court's Preliminary Approval order of June 22, 2010 (Docket No. 169), as modified on January 24, 2011 (Docket No. 175), the Class has been defined as:

> Class A: The 75 individuals who opted into the *Bowne* and *Basore* litigation.
>
> Class B: The approximately 592 individuals who did not join the litigation, but who recorded 5 hour more hours of overtime that was not approved in WebTime by a manager during the time that manager approval in WebTime was required for the payment of overtime, from January 21, 2003 through the date of Preliminary Approval.
>
> Class C: A California class of approximately 3,102 Loan Processors employed by Wells Fargo from January 21, 2003 through the date of Preliminary approval.[2]

2. A total fund of $7,218,512 was established to resolve the litigation (the "Total Settlement Fund"). From this total, a non-reversionary fund of $3,115,193 will be distributed to all

---

[2] Because many individuals are members of more than one class, the total number of class members is 3,544.

16

1  class members. A claims-made fund of $2,545,579 was made available to the California Class C
2  Members for "off the clock" overtime claims. Just over half of that fund, $1,287,667.68, will be
3  distributed to the Class C members who returned claim forms. Finally, $1,557,739 will be
4  distributed to Class Counsel for attorneys' fees and costs.

5       3.    The Court finds and concludes that notice has been given to all Class Members
6  known and reasonably identifiable, and was the best notice practicable under the circumstances,
7  fully satisfying due process and the requirements of Rule 23 of the Federal Rules of Civil Procedure.

8       4.    The Court finds that the reaction of the class was supportive of the settlement. Of the
9  approximately 3,544 individuals receiving notice, 3,535 (or 99.75%) remained part of the settlement
10 and will receive a distribution from the settlement.

11      5.    Nine individuals opted out of the settlement and are, therefore, not included in or
12 bound by this Order and may individually pursue claims (if any) against Defendants. Attached
13 hereto is a list setting forth the name of each person who submitted a request for exclusion from the
14 Class. The persons so identified shall be neither entitled to benefits from the Settlement nor bound
15 by it.

16      6.    All Class Members who have not submitted an exclusion request shall be bound by
17 the Settlement and shall be deemed to have released, waived, and discharged any and all claims as
18 set forth in the Settlement Agreement.

19      7.    The Court approves the Settlement Agreement as fair, reasonable, and adequate. The
20 Court finds that the settlement reached in this complex wage and hour case constitutes a fair,
21 adequate and reasonable compromise of a bona fide dispute involving many contested legal and
22 factual issues.

23      8.    The Court approves as fair and reasonable Class Counsel's request for $1,557,739 in
24 attorneys' fees and costs.

25      9.    The Court approves the payment of Incentive Awards in the amount of $7,500 for
26 each of the three named Plaintiffs, Mary Basore, Brenda McMillian and Trudy Bowne, and approves
27 Incentive Awards in the amount of $1,000 for each of the six opt-in Plaintiffs who gave depositions.
28

10. The Court hereby orders Wells Fargo to comply with the funding requirements of the Settlement Agreement and wire the $3,115,193 Fund, the portion of the $2,545,579 Fund claimed by Class C members ($1,287,667.68), and the applicable payroll taxes, to the Third Party Administrator within 10 days of the Effective Date. Wells Fargo shall also wire Class Counsel's attorneys' fees within 10 days of the Effective Date.

11. The Third Party Administrator shall disburse settlement funds to the Class in accordance with the Settlement Agreement within 30 days of the Effective Date.

12. The Court has considered the objection of Nicola Davies and the Court overrules that objection. Because the Court finds the objection to be without merit, the Court orders the Objector to post an appeal bond in the amount of $20,000 if she intends to file an appeal.

13. The Court hereby retains continuing jurisdiction over (a) implementation of the Settlement; (b) any further proceedings, if necessary; and (c) the parties and the Class Members for the purpose of construing, enforcing, and administering the Settlement Agreement.

This order disposes of Docket No. 179.

IT IS SO ORDERED.

Dated: August 2, 2011

_____
EDWARD M. CHEN
United States District Judge

In Re Wells Fargo Loan Processor Overtime Pay Litigation

Timely Received Exclusion Requests as of July 15, 2011

| # | GCG ID# | NAME |
|---|---------|------|
| 1 | 8 | SARAH WINGO |
| 2 | 1000254 | EVELYN R GREEN |
| 3 | 1000425 | DEBRA A MYERS |
| 4 | 1000592 | BRANDON J VITALE |
| 5 | 1000631 | LILA JANE ACEVEDO |
| 6 | 1000789 | SUSAN I BAO |
| 7 | 1002856 | CAROL A POTTS |
| 8 | 1003041 | MARKEITA ROUSH |
| 9 | 1003608 | PAMELA C WHITLEY |